CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED
MAR 14 2025
LAURA A. AUSTIN, CLERK
BY: s/ H. MCDONALD
     DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| ESSIE G., ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 4:23-cv-00023 |
| ) | |
| v. ) | **MEMORANDUM OPINION** |
| ) | |
| COMMISSIONER OF SOCIAL ) | By:  Hon. Thomas T. Cullen |
| SECURITY, ) | United States District Judge |
| ) | |
| Defendant. ) | |

Plaintiff Essie G. ("Essie") filed suit in this court seeking review of the Commissioner of Social Security's ("Commissioner") final decision denying her claim for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–433. Essie suffers primarily from debilitating knee and back pain. Following a remand from this court, an administrative law judge ("ALJ") concluded that, despite her limitations, Essie could still perform a range of sedentary work. Essie challenges that conclusion, calling for reversal and remand on numerous grounds. Because the ALJ failed to heed this court's directions when it previously remanded this case and failed to address Essie's well-documented pain in a manner that enables this court to review her ultimate conclusion, remand is appropriate.

## I.   STANDARD OF REVIEW

The Social Security Act (the "Act") authorizes this court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The court's role, however, is limited; it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment"

for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted). Instead, in reviewing the merits of the Commissioner's final decision, a court asks only whether the ALJ applied the correct legal standards and whether "substantial evidence" supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 99–100 (1991)).

In this context, "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (internal quotation omitted). But "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social

Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant: (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his past relevant work (if any) based on his residual functional capacity ("RFC"); and, if not (5) whether he can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II.    RELEVANT PROCEDURAL HISTORY AND EVIDENCE

Essie filed for DIB benefits on July 9, 2014. (*See* R. 16.) She originally claimed a disability onset date of April 15, 2011, and alleged disability on account of: "osteoarthritis; pain in her leg, hands, back, and knees; memory loss, mental illness, and an emotional disorder; and high blood pressure." *Essie G. v. Comm'r of Soc. Sec.*, No. 4:18-cv-00001, 2019 WL 9075876, at *2 (W.D. Va. March 1, 2019) (Report and Recommendation) (hereinafter "*Essie I*").[1] Although she originally claimed a disability onset date of April 15, 2011, at a hearing before an ALJ, she amended that to allege an onset date of December 22, 2012. *Id.* In December 2016, the ALJ issued a "partially favorable decision . . . holding that Essie was disabled as of December 21, 2016 . . . ." *Id.*

---

[1] Although not available in an online reporter, the Report and Recommendation was adopted—without objection by the Commissioner—on March 21, 2019. *See* Order, *Essie G. v. Comm'r of Soc. Sec.*, No. 4:18-cv-00001 (W.D. Va. March 21, 2019) (ECF No. 19).

Essie appealed the determination that she was not disabled from December 22, 2012, through December 21, 2016, to this court, and her case was remanded to the Commissioner for further proceedings. *Id.* at *10. In so doing, the court instructed the ALJ to "evaluate the effects of Essie's complaints of pain, if deemed credible, on her ability to concentrate and stay on task." *Id.* at *3 n.7.

On remand, the ALJ held a hearing on March 14, 2023, and issued a written decision denying her claim on March 23, 2023. (R. 653–73.) Although the ALJ found that Essie suffered from several severe impairments—degenerative joint disease of the right knee, degenerative disc disease, osteoarthritis of the left knee, obesity, and affective disorder—she determined that Essie could still perform work at the sedentary level, with additional limitations. (*See generally* R. 656–73.) Essie appealed that decision, but the Appeals Council denied her appeal, making the ALJ's written decision the final decision of the Commissioner as of August 17, 2024. (R. 643–46.)

**A.    Legal Framework**

A claimant's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week, despite his medical impairments and related symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). The ALJ makes the RFC finding between steps three and four of the five-step disability determination. *See Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017) (citing 20 C.F.R. § 404.1520(e)). "This RFC assessment is a holistic and fact-specific evaluation; the ALJ cannot conduct it properly without reaching detailed conclusions at step 2 concerning the type and [functional] severity of the claimant's impairments." *Id.*

The Commissioner "has specified the manner in which an ALJ should assess a claimant's RFC." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). First, because RFC is by definition "a function-by-function assessment based upon all of the relevant evidence of [the claimant's] ability to do work related activities," SSR 96-8p, 1996 WL 374184, at *3, the ALJ must identify each impairment-related functional restriction that is supported by the record, *see Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016). The RFC should reflect credibly established "restrictions caused by medical impairments and their related symptoms"—including those that the ALJ found "non-severe"—that impact the claimant's "capacity to do work-related physical and mental activities" on a regular and continuing basis. SSR 96-8p, 1996 WL 374184, at *1, *2.

Second, the ALJ's decision must include a "narrative discussion describing" how specific medical facts and non-medical evidence "support[] each conclusion" in the RFC assessment, SSR 96-8p, 1996 WL 374184, at *7, and logically explaining how he or she weighed any inconsistent or contradictory evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311. Generally, a reviewing court will affirm the ALJ's RFC findings when he or she considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and the written decision built an "accurate and logical bridge from that evidence to his [or her] conclusion[s]," *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018), *superseded by Rule on other grounds as recognized in Rogers v. Kijakazi*, 62 F.4th 872 (4th Cir. 2023) (internal quotation omitted). *See Shinaberry v. Saul*, 952 F.3d 113, 123–24 (4th Cir. 2020); *Thomas*, 916 F.3d at 311–12; *Patterson*, 846 F.3d at 662–63.

**B.     Medical Evidence**

In April of 2011, Essie quit working as a nursing assistant because of the pain in her knees and hands. (*See* R. 43–44.) On April 18, 2011, she underwent a total right knee replacement. (R. 627.) The next month, her physical therapist reported that Essie was "not progressing," and that she only had a 20-degree range of motion "and has not gained 1 degree in over a month." (R. 624.) At a follow-up appointment with Dr. Sydnor, her orthopedic surgeon, she reported that she "has had some discomfort and has been unwilling to push the knee, and has not had . . . the therapist working very hard with her knee." (R. 623.) Nevertheless, Dr. Sydnor noted that, except for the stiffness and limited range of motion, there was "no evidence of complications otherwise about the knee." (*Id.*)

On July 14, 2011, Essie reported to the Halifax Regional Hospital emergency department complaining of pain in her legs. She stated that her "left knee and lower leg has been achy the past few days," and that when her physical therapist touched her knee earlier that day, the area "hurt really bad and she felt a lump and was worried about a clot." (R. 423.) Essie reported that the pain was a 6 on the 10-point pain scale and that she had been prescribed Vicodin for pain management. (*Id.*) Her knee was x-rayed; there was no acute fracture noted, although the radiologist reported that "[d]egenerative changes of osteoarthritis are seen with narrowing of the medial and lateral knee joint compartments." (R. 424, 431.) She was discharged with instructions to ice her knee, continue taking pain medication, and return the next day for an ultrasound of her knee, presumably to rule out a blood clot. (R. 421, 425.)

On October 16, Essie returned to the emergency department after her knee "gave out on her in the bathroom" and she fell. (R. 418.) Essie complained of pain in her left shoulder,

elbow, and left side of her back. (*Id.*) An exam showed no evidence of soft tissue damage, although Essie did report "mild to moderate joint pain with movement of the right anterior knee." (R. 419.) Essie was prescribed prednisone and directed to follow-up with her primary care physician. (*Id.*)

Later that month, on October 21, Essie had a follow-up with Dr. Sydnor following her knee replacement. Although Essie had completed physical therapy a few weeks prior, she complained "that both knees ache all over." (R. 606.) Dr. Sydnor noted that Essie "does have significant degenerative changes as seen on x[-]rays on the left side." (*Id.*) At the time, Essie did not believe she could return to her former job "because of her pain." (*Id.*) Dr. Sydnor gave Essie an injection in her left knee to help with the pain, advised that she could get an injection every 4 months, and told her that a total knee replacement was necessary. (*Id.*) He also advised that she find a job that was less physically demanding, such as "private house sitting." (*Id.*) Essie tolerated her injection well and advised that she would let Dr. Sydnor know when she was ready to undergo the total knee replacement. (*Id.*)

Essie returned to Dr. Sydnor on November 30, complaining of "cramping in her right lower leg, . . . start-up stiffness, . . . [and] lumbar back pain." (R. 602.) She also reported "numbness in the lateral lower leg and great toe." (*Id.*) Dr. Sydnor diagnosed her with sciatica and lumbar pain, prescribed physical therapy and Tramadol and Lortab for pain, and noted that an x-ray or MRI may be necessary if her symptoms did not improve. (R. 602–03.)

Essie did have an x-ray in December, and she was noted to have "mild scoliosis in the lumbar region and anterior spurs at L4-5 and L5-S1 levels with some slight decrease in disc space height." (R. 600.) Dr. Sydnor ordered an MRI "to better guide treatment." (R. 596.) That

MRI was conducted in January of 2012 and "revealed a rather straight lumbar spine with black disk noted at L3-4. There is bulging of the disk with a fairly focal protrusion at L4-5 level. There is mild to moderate stenosis at the L3-4 level." (R. 592.) Essie reported "bilateral buttocks pain that alternates and is ill defined." (*Id.*) Dr. Sydnor ordered an epidural steroid injection ("ESI") at L4-5 centrally, and ordered Essie to return in 2 months. (*Id.*) Dr. Huerta performed the ESI on March 7, 2012, and Essie tolerated the procedure well. (R. 591.)

Essie returned to Dr. Sydnor on June 27, 2012, for a "recheck on her LBP [lower back pain] and sciatica." (R. 585.) Although Essie had the first ESI, she reported that she could not afford a second one. (*Id.*) She also reported continued "bilateral buttocks pain and leg pain, and numbness in both feet that is ill defined." (R. at 585.) She also reported increased pain at night and left knee pain. (*Id.*) Dr. Sydnor injected her left knee at that appointment. (R. 585.)

At her next appointment with Dr. Sydnor on October 10, Essie reported continued "bilateral buttocks pain and leg pain, and numbness in both feet that is ill defined." (R. 580.) Essie also reported that she was taking muscle relaxers "that seem to help." (*Id.*) At that appointment, Essie also complained of "bilateral knee pain" and, on examination, Essie showed "pain at end-ranges." (R. 580–81.) Essie requested another injection in her left knee, which Dr. Sydnor performed. (R. 580.) He also ordered a bone scan of her right knee to evaluate her prosthesis. (*Id.*) Again, Essie was unable to afford a second ESI for her back. (*Id.*)

In December of 2012, Essie fell twice. When she returned to Dr. Sydnor, she reported that, during one fall, she hit her knee. (R. 576.) Dr. Sydnor also reviewed the bone scan that he had previously ordered, which showed "increased uptake under the medial aspect of the tibial component." (*Id.*) Dr. Sydnor noted that this could "be related to some loosening or

unusual stress line across the medial compartment . . . ." (*Id.*) A review of Essie's systems notes "[b]ack pain" and "[f]requent joint stiffness." (R. 578.) Her records also reveal that she was prescribed Oxycodone for pain. (R. 577.)

Around this time, Essie frequently reported pain and tenderness to her primary care physician, Dr. Pambid. In October 2012, she reported lumbar spine tenderness and knee joint tenderness. (R. 463.) Dr. Pambid also noted that Essie suffered from "chronic, not controlled" knee and back osteoarthritis. (*Id.*) On November 19, Dr. Pambid noted that Essie had "[k]nee joint tenderness" that was "tender and inflamed," and he noted that she had had "pain medial aspect of left knee for years also." (R. 460–61.) On November 29, Essie presented again with "[k]nee joint tenderness inflamed left > r[igh]t." (R. 458.) And on January 13, 2013, Dr. Pambid noted that Essie had both hip and knee-joint tenderness, along with peripheral neuropathy. (R. 455.)

In June 2013, Essie saw Dr. William MacCarty with Southern Virginia Orthopedics. Her chief complaints were left knee and hip pain, bilateral elbow pain, and numbness in both hands and feet, as well as a history of chronic back pain. (R. 336.) She reported that she had lower back pain radiating to her left buttock for over a year. (*Id.*) When asked to rate her pain, she gave it a 9 on the 10-point pain scale. (R. 339.) Dr. MacCarty performed pain injections in Essie's left knee and right elbow, counseled her on weight loss for her back pain, and advised her that she needed "bilateral carpal tunnel release with neurolysis." (R. 340.)

Two months later, on August 7, 2013, Essie saw Dr. MacCarty in preparation for her right carpal tunnel release surgery. (R. 330–335.) At the time, she rated the pain in her left hand as 10/10. (R. 333.) After her surgery, she reported that the pain in her right hand was

- 9 -

6/10. (R. 326–27.) Approximately a week after her surgery, Essie reported her right-hand pain had reduced to 3/10. (R. 322.)

Essie had left carpal tunnel release surgery on October 14, 2013. (*See* R. 318.) At a follow-up appointment on October 17, Essie reported that the pain in her left hand was 6/10. (R. 316.) At a 10-day post-surgery follow-up, her pain was down to 3/10. (R. 310.)

Essie saw Dr. MacCarty again on January 10, 2014, where she complained of back pain. (R. 303.) Essie reported that her pain was 10/10, and her physical exam revealed abnormal thoracolumbar flexion, spinous process tenderness, sacroiliac joint tenderness, and paraspinal muscle tenderness and tightness. (R. 305–06.) Her lateral bending, both right and left, were abnormal, and it was painful to bend both forward and laterally. (R. 306.) In his notes, Dr. MacCarty wrote, "I think [Essie] has chronic mechanical low back pain and possibly left lumbar radiculopathy. I think her hip pain is possibly related to her back, worse with early degenerative disease of the left hip." (R. 307.) He injected Celestone intramuscularly, set her up for therapy, wrote a prescription for Vicodin, and advised her that, "if she needed chronic pain medicine[,] she has to get this either from her family physician or a chronic pain physician." (*Id.*) X-rays taken at that visit showed "widespread degenerative disease in the lumbar and lower thoracic spine." (R. 302.)

On June 11, 2014, Essie returned to Dr. Pambid, again complaining of "pains in backs, hip left and lefts and wrists." (R. 444 [*sic* throughout].) She was diagnosed with "[d]egeneration of lumbar intervertebral disc: chronic, not controlled" and "[m]echanical low back pain." (R. 446.) She was prescribed Tramadol for pain. (*Id.*)

In September of 2014, Essie saw Dr. Saleeby for pain management. (*See* R. 498–501.) She complained of low back pain and severe left lower extremity pain that developed several years ago. (R. 498.) She reported that she was getting shots in her knee and "was told that she needs a knee replacement . . . but does not want surgery right now . . . ." (*Id.*) She also reported that neither physical therapy nor Tramadol were effective at managing her pain, but that hydrocodone "was helping better in relieving the pain." (*Id.*) Factors that aggravated her pain included "sitting for long periods, walking, standing for long periods, standing, and everything." (*Id.*) Dr. Saleeby reviewed her records and noted that Essie had "degenerative disc disease . . . present multiple levels." (*Id.*) Dr. Saleeby prescribed hydrocodone and directed Essie to return in 4 weeks. (R. 501.) But on December 10, 2014, Essie told Dr. Pambid that she was no longer going to the pain management clinic because it was too expensive and requested that he prescribe her Tramadol. (R. 538.)

Essie returned to her orthopedist's office on September 12, 2014, and saw Dr. Treadway. He noted a "long-term history of left knee pain" and that she "had prior injections several years ago by Dr. MacCarthy [*sic*]" and was requesting another. (R. 504.) Essie reported that the pain in her left knee was 7/10. (R. 505.) Dr. Treadway gave Essie the requested injection, which she tolerated well, and he instructed her to follow up with Dr. MacCarty. (R. 506.)

Essie saw Dr. MacCarty on February 9, 2015, for her left knee pain. (R. 546–49.) She reported that she has had pain in her knee for more than 14 years, but that it had been "severe" the last year. (R. 546.) He diagnosed her with "Knee pain – Left knee: chronic, severe exacerbation," and gave her an ESI; he wanted to inject her with Synvisc One, a hyaluronic

acid preparation, but Essie reported that her insurance would not cover that procedure. (R. 549.) Dr. MacCarty instructed her to call the office in the event her insurance approved the Synvisc One injection. (*Id.*) Dr. MacCarty also ordered another x-ray of her left knee (*id.*), which showed "tricompartmental degenerative disease." (R. 550.).

Essie returned to Dr. MacCarty on December 16, 2015, complaining of bilateral knee pain. (R. 562.) She noted that her pain was 8/10 and "constant." (R. 564.) Dr. MacCarty advised her that "the only thing that could be done to her left knee would be a replacement," but Essie could not afford that. (R. 565.) Likewise, she could not afford the Synvisc One injection because of the cost. (*Id.*) He advised her to return to pain management. (*Id.*)

**C.    Opinion Evidence**

On initial review of Essie's DIB application, state agency examiner Howard Leizer, Ph. D., found that Essie suffered from a severe impairment—dysfunction of a major joint. (R. 91.) He opined that, with that severe impairment, Essie could nevertheless occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk "[a]bout 6 hours in an 8-hour workday," sit (with normal breaks) for "[a]bout 6 hours in an 8-hour workday," and could push and pull an unlimited amount. (R. 93.) He further opined that she could occasionally climb ladders, ropes, or scaffolds, but had no other postural limitations. (*Id.*) Based on these findings, Dr. Leizer opined that Essie had the RFC to perform "light" work as defined by the applicable regulations and was therefore not disabled under the terms of the Act. (R. 94.)

Essie appealed and, on reconsideration, state agency examiners Eric Oritt, Ph. D., and Luc Vinh, M.D., opined that Essie suffered from the following severe impairments:

dysfunction of major joints; "DDD (Disorders of Back-Discogenic and Degenerative)"; and affective disorder. (R. 105.) Like Dr. Leizer, Dr. Vinh opined that Essie could nevertheless occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk "[a]bout 6 hours in an 8-hour workday," sit (with normal breaks) for "[a]bout 6 hours in an 8-hour workday," and could push and pull an unlimited amount. (R. 107.) But Dr. Vinh included additional postural limitations. He limited her to occasional climbing of ramps and stairs, climbing of ladders/ropes/scaffolds, stooping, kneeling, crouching, and crawling. (*Id.*)

As it related to Essie's affective disorder, Dr. Oritt opined that she was not significantly limited in her "ability to remember locations and work-like procedures" or her "ability to understand and remember very short and simple instructions," but that she was moderately limited in her "ability to understand and remember detailed instructions" and that she had "sustained concentration and persistence limitations." (R. 108.) He further found that Essie was moderately limited in her ability "to carry out detailed instructions," "to maintain attention and concentration for extended periods," and "to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (R. 108–09.) Regarding social limitations, Dr. Oritt opined that Essie was moderately limited in her ability "to interact appropriately with the general public," "to accept instructions and respond appropriately to criticism from supervisors," and "to get along with coworkers or peers without distracting them or exhibiting behavioral extremes." (R. 109.) Based on these findings, Dr. Vinh concluded that Essie could perform light work and was, therefore, not disabled. (R. 110–11.)

**D.     Relevant Testimony**

At a hearing before the ALJ, Essie testified briefly about her use of a cane, a walker, and her "rollator." (*See generally* R. 687–96.) Apparently, all parties believed that the issue of Essie's use of a walker was the primary basis for the court's prior remand. (*See, e.g.*, R. 685–86.)

A vocational expert also testified and opined that, given the hypotheticals posed by the ALJ, there were a number of sedentary jobs in the national economy that Essie could have performed during the relevant period. (*See* R. 697–702.) Of note, however, he testified that, if Essie was required to use a rollator, "it would eliminate all work." (R. 700.)

**E.     The ALJ's Opinion**

In the operative decision, the ALJ concluded that Essie suffered from: degenerative joint disease of the right knee, status post total knee replacement; degenerative disc disease; osteoarthritis of the left knee; obesity; and affective disorder.[2] (R. 656.) She found that Essie did not suffer from "an impairment or combination of impairments" that met or medically equaled one of the listed impairments in the applicable regulations. (R. 657.) "After careful consideration of the entire record," the ALJ found that Essie had the RFC

> to perform sedentary work as defined in 20 CFR 404.1567(a) except that she is limited to standing and walking 2 hours in an 8-hour workday with the use of a cane for ambulation and standing; she is limited to occasional climbing, stooping, kneeling, crouching, and crawling; she is able to understand and remember simple instructions and use judgment to make simple work-related decisions; she is able to carry out simple instructions, but cannot work requiring a specific production rate such as assembly line work or work requiring hourly quotas; and

---

[2] The ALJ also determined that Essie's asthma, hypertension, hyperlipidemia, gastroesophageal reflux disease, peripheral neuropathy, right epicondylitis, orthostatic hypotension, vision impairments, and carpal tunnel syndrome were medically determinable impairments, but they were not severe enough to render her disabled. (R. 657.) Essie does not challenge this determination.

>she is able to engage in frequent interaction with the public, coworkers, and supervisors.

(R. 661.) As a result, the ALJ found that a significant number of jobs exist in the national economy that Essie can perform—such as document preparer, telephone order clerk, or addressing clerk—and that Essie therefore was not under a disability from December 21, 2012, through December 20, 2016. (R. 672–73.)

### III.   ANALYSIS

Essie's primary argument is that the ALJ failed to properly account for her well-documented pain when determining whether her RFC required any limitations on her ability to "concentrate and stay on task." While it is true that the ALJ excluded Essie from work "requiring a specific production pace such as assembly line work or work requiring hourly quotas" and she limited her to "frequent interaction with the public, coworkers, and supervisors" (R. 661), the most the court can glean from the ALJ's written opinion is that those limitations are meant to account for Essie's "mental complaints"—her affective disorder—not her chronic pain (R. 656, 667).

When evaluating a claimant's symptoms, ALJs must use the familiar two-step framework. "First, the ALJ must determine whether subjective medical evidence presents a 'medically determinable impairment' that could reasonably be expected to produce the claimant's alleged symptoms." *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir. 2020) (citing 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3). "Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether the claimant is disabled." *Id.* (citing 20 C.F.R. § 404.1529(c). SSR 16-3p, 2016 WL

1119029, at *4). Social Security Ruling 16-3p acknowledges that "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques." SSR 16-3p, 2016 WL 1119029, at *4. "Thus, the ALJ must consider the entire case record and may 'not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms merely because the objective medical evidence does not substantiate' them." *Arakas*, 983 F.3d at 95 (quoting SSR 16-3p, 2016 WL 1119029, at *5). "[W]hile there must be objective medical evidence of some condition that could reasonably produce the pain, there need not be objective medical evidence of the pain itself or its intensity." *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989).

Here, *if* the ALJ intended to account for Essie's well-documented pain and its limiting effects in her RFC, she failed to explain it. In her discussion of the RFC and specifically the limitations regarding a production rate, the ALJ mentioned *only* Essie's "mental complaints," not those of pain. That the ALJ's RFC failed to account for Essie's pain is buttressed by the fact that, earlier in her decision, she expressly recognized that Essie had "reported that she had concentration problems due to being miserable and mad that she could not work." (R. 660.) In fact, Essie reported that her pain is so severe that, occasionally, she "wants to do 'evil things' when her pain becomes severe, but she prays to get through it." (R. 103.) She also reported that she is unable "to complete tasks secondary to joint pain." (*Id.*) What's missing, however, is any indication that the ALJ considered this evidence in crafting limitations on her ability to concentrate and stay on task. Perhaps the ALJ considered Essie's testimony but rejected it, and perhaps she had a valid reason for doing so. But her analysis is silent on this critical issue.

It is also true that the ALJ found that Essie had a "moderate limitation" "[w]ith regard to concentrating, persisting or maintaining pace . . . ." (R. 660.) But that conclusion is expressly within the section of her opinion regarding Essie's mental impairment (*see* R. 659–60), and it makes no mention of Essie's regular and well-documented complaints of pain (*see, e.g.*, R. 303, 305 ("Pain Scale: 10/10"), 316, 324, 327, 333 ("Pain Scale: 10/10"), 336–37 (describing the nature of Essie's back, elbow, hip, knee, and wrist/hand pain), 339 ("Pain Scale: 9/10"), 444 ("Has pains in backs, hip left and lefts and wrists" [*sic* throughout]), 448, 457, 460, 485, 488, 498 ("The left lower extremity pain developed several years ago, is severe and is localized to the knee"), 505, 507 ("Patient's [*sic*] had pain in the left hip for a year or more."), 546 ("The patient has had pain in her left knee for 14 or more years. It has been severe the last year."), 549 ("Knee pain – Left knee; chronic, severe exacerbation"), 564 ("Pain Scale: 8/10"), 580–81, 585–86, 592, 1050, 1066).

The Commissioner counters that the ALJ did consider Essie's pain. Of course, that's correct—at least in a general sense. (*See, e.g.*, R. 662.) But a generic consideration that Essie has pain was not the directive of this court. Rather, the ALJ was directed to consider, among other things, *how* that pain affected her ability to concentrate and stay on task. The ALJ did determine, as was her place to do, that Essie's "statements about the intensity, persistence, and limiting effects of her symptoms . . . are inconsistent because [she] and her husband admitted that she engaged in a wide range of activities that show she is not as limited as alleged."[3] (*Id.*)

---

[3] The court notes that "the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015). For example, the ALJ says the Essie's husband says that she "can pay attention well," but he does not say for *how long* she can concentrate. Given Essie's documented complaints of intermittent

But that only gets the ALJ halfway to compliance with this court's remand order. *How* limited was she—and specifically how did the pain that the ALJ found she *did* suffer from affect her ability to concentrate and stay on task during an 8-hour workday? The ALJ does not say, and the court is left to guess whether this assessment was ever made. Without that analysis, remand is necessary to give the ALJ another opportunity to comply with this court's directives.[4]

## IV.    CONCLUSION

For the foregoing reasons, the court will remand this matter to the Commissioner for further proceedings consistent with this Opinion.

**ENTERED** this 14th day of March, 2025.

                                                    */s/ Thomas T. Cullen*
                                                    HON. THOMAS T. CULLEN
                                                    UNITED STATES DISTRICT JUDGE

---

severe pain, the ALJ should consider how she well she can concentrate and stay on task when her pain returns to the documented highs—to the extent her testimony is credited.

[4] On remand, the ALJ should carefully review the court's opinions on Essie's case and take pains to address *all* the flaws identified by the court—regardless of whether they are found in a footnote or the body of the opinion. And although the court does not address the other claimed errors in the ALJ's analysis, the court does note that there are several other deficiencies, including those noted by the prior opinion. *See Essie I*, 2019 WL 9075876, at *8–9 (outlining several deficiencies and noting that the prior ALJ's "written analysis . . . was so conclusory, and at points materially incomplete or contradictory, that I am 'left to guess about how the ALJ arrived at [her] conclusions' on Essie's ability to perform work-related functions on a sustained basis" (quoting *Mascio*, 780 F.3d at 637)).